IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CIVIL ACTION NO.
1:14-CR-00313-AT-LTW

VARUN BHATT,

　　　Defendant.

## MAGISTRATE JUDGE'S REPORT AND  RECOMMENDATION

This case is presently before the Court on Varun Bhatt's ("Defendant") Motion to Suppress Statements.  (See Docs. 11, 30).  For the reasons outlined below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**. (Docs. 11, 30).

## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant argues in his Motion to Suppress Statements that federal and local law enforcement officials executing a search warrant at his residence placed him in custody and unlawfully questioned him without giving him Miranda warnings.  The Government opposes the Motion, arguing that Defendant was not in custody for the purposes of Miranda protections.[1]

_____

[1] Although Defendant moved to suppress statements in part on the basis that his statements and confession may not have been voluntarily given (Doc. 11), Defendant does not contend in his Post Hearing Brief that the statements made during his interrogation were involuntary, only making passing reference to the standard (Doc. 30).  Defendant has therefore failed to perfect, delineate the arguments for, or

## I.     FACTUAL BACKGROUND

On May 30, 2014, Special Agent Michael Ashley ("Ashley") of the Federal Bureau of Investigations (FBI) executed a search warrant in connection with the investigation of the sharing of child pornography via peer-to-peer computer programs at Defendant's residence in Lilburn, Georgia. (Tr. of May 19, 2015 Evidentiary Hrg., Doc. 29, hereinafter "Tr.," 5-7).  Around 6:30 a.m., Ashley and a team of approximately twelve or thirteen law enforcement officials from the FBI, the Department of Homeland Security ("DHS"), and the local police force, arrived at the Defendant's residence.  (Tr. 6-7, 10, 56).  Special Agent Dianna Ford from DHS's Homeland Security Investigations ("HSI") and Lieutenant Christopher Dusik from the City of Lilburn Police Department ("LPD"), were among the law enforcement officials present for the execution of the search warrant, though Dusik testified this his primary role was to observe.  (Tr. 56-57,

_____

otherwise expound upon the basis for the preliminary Motion to Suppress Statements as it relates to the voluntariness of his statements.  Moreover, after the Government argued in much greater detail that Defendant's statements and confession were voluntarily provided (Doc. 35, pp. 15-16), Defendant did not file a reply in response to the Government's argument, and confirmed to the Court that he did not wish to respond further to any facts or arguments presented in the Government's opposition to the Motion to Suppress Statements.  Accordingly, Defendant's Motion in relation to those subjects has been abandoned.  See United States v. Cadet, No. 1:11-CR-00522-WBH, 2013 WL 504892, at *9 (N.D. Ga. Jan. 16, 2013), R. & R. adopted, No. 1:11-CR-113-WBH-2, 2013 WL 504815 (N.D. Ga. Feb. 8, 2013) (citing United States v. Chappell, No. 1:10-CR-513-WSD-ECS, 2011 WL 5353016, at *5 (N.D. Ga. May 25, 2011) (deeming argument defendant raised in pre-hearing motion, but did not expound upon in post-hearing briefs, to be waived and abandoned); United States v. Shorr, No. 1:07-CR-182-1-TWT, 2008 WL 655994, at *1 (N.D. Ga. Mar. 10, 2008) (same).  As a result, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED AS ABANDONED** as to his arguments that his statements were not voluntarily provided.

2

73-77).

Ashley approached the door with a number of federal agents, knocked, identified himself and those federal agents accompanying him, and announced that they possessed a warrant to search the residence. (Tr. 9-11). Ashley knocked harder after it took some time for someone to answer, but did not scream or attempt to knock down the door. (Tr. 11-12, 59). At the time, the federal agents were dressed in tactical gear, including vests, shirts, or jackets indicating that they were federal agents. (Tr. 11-12, 31). Ashley, in the lead, had his weapon holstered, while one or two of the other federal agents had their weapons displayed but pointed away from any occupant of the residence. (Tr. 11-12, 31). Dusik, clad in tactical gear, and two or three uniformed LPD officers remained outside the residence, to the side, and were not part of the entry team. (Tr. 75-76). The uniformed LPD officers were present for perimeter security and safety purposes, primarily so that the occupants of the residence understood that law enforcement officials, rather than robbers or home invaders, were attempting entry. (Tr. 75-76).

Defendant and his wife, father, and mother opened the door together. (Tr. 9-10, 32). The four adults were asked to come outside, which they did, and the men were placed in handcuffs. (Tr. 9, 59). The four adults were told they were not under arrest and that the men were only being handcuffed for safety purposes while the house was cleared. (Tr. 9-10). Two or three federal agents, whose weapons were holstered, remained outside with the four adult residents. (Tr. 9-13, 28, 53). The remaining federal agents entered the home and secured the premises by clearing the rooms, looking

3

for other residents, weapons, or other dangers. (Tr. 9-13, 28, 53). Defendant's two young children, both under the age of six, were discovered sleeping and were kept inside the house. (Tr. 12, 32, 60). After clearing the home, the federal agents re-holstered their weapons and removed their tactical gear. (Tr. 12-13). The law enforcement officers told the four adults that "everything is okay," brought them back into the living room with the children, and removed their handcuffs. (Tr. 9-10, 38, 86). Ashley reiterated that the four adults were not under arrest, but "if they stayed they would not be able to walk around the residence unaccompanied."[2] (Tr. 9-10, 38, 86). The adults were to be accompanied for safety purposes and for the preservation of evidence during the execution of the search warrant. (Tr. 14). No arrest warrants had been issued, and the agents did not intend to arrest anyone that day. (Tr. 5, 68; see also Def.'s Ex. 1 (Search Warrant)). Defendant's mother testified at the evidentiary hearing that Defendant and his father were in handcuffs for no more than ten to fifteen minutes, though she was not certain. (Tr. 87).

Once in the living room, the four adults sat down or were seated on the couch, and while the women appeared to be somewhat upset or nervous, Defendant and his father appeared fairly calm. (Tr. 14-15). The two men were still in their boxers, having been

---

[2] No testimony was elicited that any agent affirmatively told Defendant or any of the adults that they were free to leave (See, e.g., Tr. 71 (Ford did not affirmatively inform Defendant he was free to leave), though Ashley testified that "if somebody wants to leave, they're given the opportunity to leave," and that if the adults had needed to go to work or take the children to school, they would have been allowed to do so. (Tr. 15).

awoken by the agents' knock.  (Tr. 15).  The women at some point got dressed.  (Tr. 14-16).  The children were playing in the living room and appeared to be very comfortable and oblivious to the presence of the agents.  (Tr. 18, 60-61).

Ford and Ashley decided to interview Defendant and his father while the search warrant was executed in order to determine which adult was involved in sharing child pornography.  (Tr. 16).  The two were interviewed simultaneously – Defendant by Ford with Dusik observing, and Defendant's father by Ashley.  (Tr. 70).  Ford asked Defendant if he would be comfortable speaking outside on the back porch of the house, which would provide privacy on a nice day (it was now after sunrise).[3]  (Tr. 23, 53, 63).  Defendant agreed and walked outside with Ford and Dusik, though he was still in the clothes he had woken up in (boxer shorts rather than pants).  (Tr. 23, 53, 63).  Once outside, Ford reiterated to Defendant that he was not under arrest, informed Defendant that the interview would be recorded, and verified that Defendant was not handcuffed.[4]  (Tr. 64).  Defendant was seated across from Ford and Dusik, by a walkway extending into the unfenced backyard, into which Defendant could have easily walked, even

---

[3] In the audio recording of the interview, the only background noise is the sounds of nature, such as birds chirping or cawing, and the sound of one train passing in the distance; there is no street noise or sounds of agents other than the voices of those interviewing Defendant.  (Gov't's Ex. 2 ((Audio Recording of Def.'s May 30, 2014 Interview)).  At the end of the recording of the interview, one of Defendant's children can be heard asking for Defendant.  (Id.).

[4] Ford's words to Defendant were, "Just to be clear, you're not under arrest, okay?  You're not handcuffed and we'd just like to take the opportunity to just talk to you, and ask a few questions 'cause you live here at this house.[']"  (Gov't's Ex. 1, at 2).

though he was not fully dressed and did not have his wallet or keys. (Tr. 23, 41-42)

The interview began around 7:00 a.m. and concluded around 9:50 a.m., with breaks between 7:52 a.m. and 7:57 a.m. and between 8:40 a.m. and 8:49 a.m. (Gov't's Ex. 1 (Tr. of Def.'s May 30, 2014 Interview), at 2, 38, 81, 116). During each break, Defendant was asked if he needed something to drink or to use the restroom. (Id. at 38, 80). Defendant took advantage of the offer at least once, without Ford's supervision. (Tr. 45-46, 64, 67). Ford primarily conducted the interview until after the second break just before 9:00 a.m., at which point Ashley began speaking with Defendant.[5] (Tr. 23; Gov't's Ex. 1, at 1-81 (Ford interview), 81-117 (Ashley interview); see also Gov't's Ex. 2).

Defendant was told no fewer than four times during the interview[6] that he was not under arrest, and even toward the end of the interview, Ashley told Defendant that "very seldom do [they] make arrests on these types of warrants." (Gov't's Ex. 1, at 38, 79, 82, 92; see also Tr. 23, 64, 66). Defendant never asked for an attorney, never asked to consult anyone, and never asked to stop the interview or leave. (Gov't's Exs. 1 & 2; see also Tr. 23). The audio recording of the interview does not reveal any point at which Defendant expressed a desire to stop the interview or even a hesitation in continuing to talk with the agents. (Gov't's Ex. 2).

_____

[5] Defendant was getting water just before Ashley interviewed him. (Tr. 45-46).

[6] As noted above, the adults were also told when they were escorted outside that they were not under arrest. (Tr. 9-10).

6

Ford and Ashley credibly testified that Defendant was not promised anything,[7] threatened, subjected to the use of force,[8] or restrained in anyway (outside of the initial entry); nor is there any indication of such treatment in the audio recording or transcript of the interview. (Tr. 23-24, 62; <u>see also</u> Gov't's Exs. 1 & 2). The agents testified, and the audio recording confirmed, that Defendant remained calm throughout the interview.[9] (Tr. 62, 64-65; <u>see also</u> Gov't's Ex. 2). Ford's discussion with Defendant was very conversational, as was Dusik's interaction with Defendant. (Tr. 62; see also Gov't's Ex 1, at 1-81; Gov't's Ex. 2). Even when Ashley explained that forensic examination of the large amount of child pornography found would reveal how and when images were downloaded and viewed, his tone remained conversational. (Gov't's Ex 1, at 81-117; Gov't's Ex. 2). The agents did not raise their voices during the interview, nor did Defendant sound particularly concerned or defensive. (Gov't's Ex. 2).

Defendant understood the questions asked, and responded without issue. (Gov't's

---

[7] Ashley did explain to Defendant that several hard drives' worth of child pornography had been found, and that Defendant's cooperation in the investigation and acceptance of responsibility might help Defendant. (Tr. 81-82). Ashley explicitly stated at that same time that Defendant was not under arrest, that Ashley would not make the decision about whether to arrest Defendant, and that Ashley could not make any promises about Defendant's cooperation. (Tr. 82).

[8] No officers or agents touched Defendant during the interview, except Ashley, who merely touched Defendant's knee briefly as a sign of sympathy. (Tr. 49-50, 62)

[9] The only occasions during which Defendant became even remotely agitated were when the agents asked him twice whether he had acted in an untoward manner with his own children. (Gov't's Ex. 2; <u>see also</u> Gov't's Ex. 1, at 66-67, 105-07). Even then, Defendant did not raise his voice, and instead calmly expressed disgust at the suggestion that he would harm his children. (<u>Id.</u>).

AO 72A
(Rev.8/82)

Exs. 1 & 2).  Though Defendant initially had difficulty clearly articulating answers to Ford's questions about possible pornographic files which had been downloaded onto his computer via a peer-to-peer network, his apparent confusion appeared to end once he was notified that many child pornography files had been discovered on his computer and multiple other hard drives.  (<u>Compare</u> Gov't's Ex. 1, at 1-61 <u>with</u> Gov't's Ex. 1, at 63-117).  Soon after, Defendant confessed to downloading and viewing child pornography and stated that he needed help.  (Gov't's Ex. 1, at 93-95, 97-102).  Defendant ultimately admitted that he looked at the images one to three times a week, viewed pornography depicting children as young as twelve-years-old, and saved most of the images only as a collector (as opposed to viewing them),[10] because he was concerned the images would no longer be available on the internet.  (Gov't's Ex. 1, at 93-95, 97-102).

Defendant accommodated the agents' questions about the location of pornographic computer files and repeatedly expressed his desire to help.  Defendant stated he was familiar with computers since he worked as a computer software analyst.  (Gov't's Ex. 1, at 4-6, 25, 31, 36-37).  Defendant readily agreed to show Ford and the other federal agents the computer and hard drive purportedly containing illicit pornography.[11]  (Gov't's Ex. 1, at 37-38, 61-63; Gov't's Ex. 2; <u>see also</u> Tr. 66).  After

---

[10] Defendant described it as "an obsession of collecting it – it's like – like you know someone wants to play a game . . . ."  (Gov't's Ex. 1, at 107; Gov't's Ex. 2).

[11] At the time Defendant shared the location of the computer and hard drive, he had not admitted to downloading or sharing child pornography; nor had he been notified of law enforcement's discovery that child pornography had been stored electronically on devices in his home.  (Gov't's Ex. 1, at 61-63).

8

Defendant was told that a computer and multiple hard drives containing child pornography had been found and would be seized pursuant to the warrant, Defendant responded, "Take whatever you need." (Gov't's Ex. 1, at 62-63, 80; Gov't's Ex. 2). Defendant also authorized, without hesitation, access to his e-mail accounts. (Gov't's Ex. 1, at 83-84, 102-104, 114-116). Ashley told Defendant at the time, "It's up to you." Defendant responded, "Yes, please," and later said, "I want to. I want to turn it over to you." (Gov't's Ex. 1, at 83-84, 102-104, 114-116; see also Gov't's Ex. 3 (Consent to Assume Online Presence Form)).

Even after Defendant confessed to his involvement with child pornography during his interview, agents still did not plan to arrest him. (Tr. 71; see also Gov't's Ex. 1, at 92. Ashley told Defendant, "Like I said, you're not under arrest. Okay. I don't make that decision. Okay? You know, when we go on these warrants, we – very seldom do we make arrests on these types of warrants. Okay? That's just the way it works because we – ." (Gov't's Ex. 1, at 92). Defendant responded, "I know." (Id.). After Defendant confessed and agreed to provide access to his e-mail accounts, the interview concluded organically so that Defendant could sign the necessary authorization forms. (Gov't's Ex. 1, at 116-17). The agents did not advise Defendant of his Miranda rights at any point before or during the interview. (Tr. 36, 67; see also Gov't's Exs. 1 & 2). Following the interview and, presumably after signing the authorization forms, Defendant rejoined his family in the living room where his children were playing. (Tr. 61, 67).

After the interview concluded, federal agents and Dusik discussed and decided that an arrest warrant would be obtained on state child pornography charges. (Tr. 26-27, 52, 54, 67, 78).  The law enforcement officers obtained the arrest warrant due to their concern for Defendant's young child because Defendant slept with the child in the bedroom that contained the computer and hard drives with child pornography.  (Tr. 26-27, 52, 54, 67, 78).  Defendant was arrested later that day.  (Tr. 26-27).  Defendant was arrested considerably later on federal charges.  (Tr. 54).

On August 19, 2014, a federal grand jury charged Defendant with distribution, receipt, and possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(2), 2252(b), 2252(a)(4)(b), and 2252(b)(2).  (Doc. 1).  On September 9, 2014, Defendant moved to suppress the statements he made during the May 30, 2014 interview.  (Doc. 11).  An evidentiary hearing was held on Defendant's Motion to Suppress Statements on May 19, 2015, at which time Ashley, Ford, Dusik, and Defendant's mother testified. (Doc. 27).  Defendant submitted a post-hearing brief on July 20, 2015.  (Doc. 30).  The Government filed a response to Defendant's post-hearing brief on August 24, 2015 (Doc. 35), and Defendant was given until September 7, 2015, to file a reply.  (Docket Entry dated Aug. 25, 2015).  The Court was notified that Defendant would not be filing a reply brief.  Accordingly, this matter is now ripe for a ruling.

AO 72A
(Rev.8/82)

## II.   LEGAL ANALYSIS

### A.   Arguments of the Parties

Defendant argues that the statements he made to federal agents should be suppressed because he made them while he was in custody and the agents never read him his Miranda rights. (Doc. 30). Defendant maintains that he was in custody because numerous armed agents arrived at his home early in the morning to execute the search warrant; he was placed in handcuffs for ten to fifteen minutes upon their initial entry into the house; he was not affirmatively told that he could leave; and within thirty minutes of their arrival, two or three agents questioned him on his back porch (without his wallet or keys) for almost three hours while his family remained in the house and agents searched the residence. Defendant contends that under the circumstances, no reasonable person would feel that he could leave, in particular due to the presence of law enforcement and his state of dress.

In response, the Government contends that the agents were not required to provide Miranda rights to Defendant because Defendant was not in custody during his interview. (Doc. 35). The Government argues Defendant was not in custody because law enforcement officers repeatedly told him that he was not under arrest; the agents did not decide to arrest Defendant until after the interview concluded and even then, the arrest was primarily for the safety of Defendant's child; agents interviewed Defendant on his own backyard porch, which was a comfortable and familiar environment; law enforcement officers did not physically harm or threaten Defendant and only handcuffed

11

AO 72A
(Rev.8/82)

Defendant until the law enforcement officers could clear his house; the agents and officers did not promise Defendant anything; even though Defendant still wore the clothes he woke up in, the law enforcement officers permitted the other adults to get dressed; Defendant could have walked away at any time and was not blocked from doing so by any agent or physical barrier; the tone of the interview was conversational; Defendant never asked for an attorney or asked to leave; and Defendant was allowed to, and did, return to his family at the conclusion of the interview.

### B.   Defendant Was Not in Custody for Purposes of Miranda

Having read and considered the arguments provided by both parties, and having heard the tape recorded interview of Defendant, the undersigned finds Defendant was not entitled to Miranda warnings because he was not in custody when he voluntarily provided statements to law enforcement agents.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial.  U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations.  Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress' attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient).

12

The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); see also United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004) (holding that the right to Miranda warnings attaches when custodial interrogation begins). The Court has come to define custody for the purposes of Miranda as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983); see also United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001). To determine whether a suspect is in custody, and thus entitled to a reading of the Miranda warnings, a Court considers the totality of the circumstances surrounding the interrogation and whether, given those circumstances, a reasonable person in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave. J.D.B. v. North Carolina, –U.S.–, 131 S. Ct. 2394, 2402 (2011); United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006); United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (holding that absent a formal arrest, a court can only conclude that a suspect is in custody when, "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave.").

The test is objective; neither the suspect's nor the officers' actual, subjective viewpoints are relevant. J.D.B., 131 S. Ct. at 2402; Peoples v. Campbell, 377 F.3d

1208, 1228-29 (11th Cir. 2004). The court looks to the perspective of a "reasonable innocent person" when making this determination. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). In considering the totality of the circumstances, "[n]o particular fact in the 'custody' analysis is outcome determinative – [the court] simply weigh[s] the totality of the circumstances." United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (quoting Brown, 441 F.3d at 1349)). Factors to be considered include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Howes v. Fields, – U.S. – , 132 S. Ct. 1181, 1189-90 (2012) (internal citations omitted). Other relevant circumstances noted by the Eleventh Circuit include whether and how the officers brandished weapons, touched the suspect, or used language or tone that indicated that compliance with the officers could be compelled. United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010); United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989)). Additionally, whether law enforcement officers advised the suspect that he is not under arrest, is free to leave, and/or is not in custody is of "substantial importance in determining whether a reasonable person would have felt free to leave." Brown, 441 F.3d 1330, 1347 (citing Muegge, 225 F.3d at 1271; see also Peoples, 377 F.3d at 1228-29. An exception to this occurs where "the restraints . . . are 'so extensive that telling the suspect he was free to leave could not cure the

custodial aspect of the interview.'" <u>Brown</u>, 441 F.3d 1330, 1347 (citing <u>Muegge</u>, 225 F.3d at 1271).

While the government bears the burden of showing that statements were obtained in compliance with the dictates of <u>Miranda</u> and were otherwise voluntary, the defendant first bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004); <u>United States v. de la Fuente</u>, 548 F.2d 528, 533 (5th Cir. 1978) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.")[12]; <u>see also</u> <u>United States v. Peck</u>, 17 F. Supp. 3d 1345, 1353-54 (N.D. Ga. 2014) (lengthy discussion that <u>de le Fuente</u> still requires defendant first carry the burden in showing he was in custody and that Miranda warnings are necessary).

Applying the law to the facts of this case, the Court concludes that the agents were not required to read <u>Miranda</u> warnings to Defendant because he was not in custody when the agents questioned him.[13]  First and most importantly, the interview took place

---

[12] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

[13] As an initial matter, since the Court considers only objective facts in determining whether Defendant was in custody, it does not consider the agents' testimony that they did not believe that Defendant was in custody, and does not consider Defendant's mother's testimony that her own experience was "terrible."

at Defendant's home.  Courts within the Eleventh Circuit are "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." Brown, 441 F.3d at 1348; see also United States v. Gomes, 279 F. App'x 861, 868 (11th Cir. 2008) (quoting Brown); United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (holding that ". . . interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); United States v. Cerreta, 63 F. App'x 585, 587 (2d Cir. 2003) (opining that an interview conducted in a bedroom during which the door was closed but unlocked and unblocked does not constitute custodial interrogation).  Even in a "police-dominated atmosphere," the fact remains that Defendant was interviewed in the "familiar surrounding," of his residence, which "strongly militates" against a finding of custodial interrogation. United States v. Graham, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *7 (N.D. Ga. June 27, 2014) (citing and quoting United States v. Rogers, No. 1:09-CR-544-TWT-ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010), adopted sub nom., United States v. Rodgers, No. 1:09-CR-544-TWT, 2010 WL 2697084, at *1 (N.D. Ga. Jul.7, 2010)).  It is true that the environment for the questioning was more restrictive than it might otherwise have been, since Defendant had not dressed for the day and was separated from his family.  The interview, however, took place in a private porch at Defendant's residence where he felt comfortable, and given the sensitive subject matter – child pornography –  "a reasonable innocent person would not conclude that being questioned behind closed doors when there were children in the house was tantamount

16

to being arrested." United States v. Peck, 17 F. Supp. 3d 1345, 1361 (N.D. Ga. 2014) (although defendant was isolated from his family in a closed bedroom with multiple agents, holding that interview about child pornography in a private setting at one's residence weight against a finding of custodial interrogation) (citing Berkemer v. McCarty, 468 U.S. 420, 441 (1984)); see also Brown, 441 F.3d at 1348-50 (interview at residence was not rendered custodial when defendant was not allowed to retrieve his shoes and did not want to leave barefooted). Furthermore, although Defendant was provided with multiple breaks during which time he was allowed to go inside, get something to drink, and use the restroom, there is no testimony or evidence that he ever asked to change clothes or obtain his wallet and keys.

Second and nearly as important, Defendant was told at least five times that he was not under arrest. While it is true the Defendant was never affirmatively told he was free to leave, there is no indication, either from the audio recording and transcript of the interview or from the testimony during the evidentiary hearing, that Defendant misunderstood the agents' repeated assurances that he was not under arrest. See United States v. Asher, No. 1:09-CR-414-JOF-AJB, 2010 WL 4192883, at *11, n.20 (N.D. Ga. Feb. 25, 2010) (rejecting the argument that defendant did not know he was not in custody when he was told repeatedly that he was not under arrest, yet not explicitly informed that he was "free to leave"), R. & R. adopted, No. 1:09-CR-414-WSD-AJB, 2010 WL 4237579 (N.D. Ga. Oct. 21, 2010). Likewise, given that the interview took place at Defendant's home, the argument that he should have been told he is free to

17

leave begs the question of where an objectively reasonable, innocent person would go. Id. at *8 ("'[T]he 'free to leave' test is somewhat ill-fitting when confronted with questioning in the suspect's home because it poses the question, if a suspect is 'free to leave' his home to escape police inquiry, where in fact does he go?'"). Moreover, at no time did Defendant ask if he was free to leave, actually attempt to leave, seek to avoid questions, end the interview, ask for an attorney, or otherwise request to seek counsel from anyone. Furthermore, at the conclusion of the interview, Defendant was not arrested, but was instead released to the house to be with his family.

Third, the interview itself did not show signs of anyone exerting undue coercion. Defendant was not threatened or restrained during the interview; he was not commanded to answer questions; the tone of the interview was conversational throughout; breaks were taken roughly every fifty minutes; and Defendant willingly and affirmatively offered his assistance during the interview by answering questions and identifying computers and hard drives with child pornography. While Defendant was led outside and handcuffed for a brief period of time when the house was initially secured, there is no evidence that these actions were taken with more than the minimal amount of force required in the situation for the law enforcement officers' security and protection of evidence. "The Eleventh Circuit has concluded a defendant was not in custody where more forceful actions, including handcuffing the defendant, were taken." Peck, 17 F. Supp. 3d at 1363 (citing United States v. Thomas, 193 F. App'x. 881, 886 (11th Cir. 2006) (no custody found even though defendant was initially handcuffed where the

handcuffs were removed when defendant was questioned, and defendant was told she was not under arrest); United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) (noting that "the fact that police handcuff the person . . . does not, as a matter of course, transform an investigatory stop into an arrest")).  Regardless, there is no evidence that Defendant was physically restrained or threatened during the interview itself.  United States v. Matcovich, 522 F. App'x 850, 852 (11th Cir.) cert. denied, 134 S. Ct. 546 (2013) (finding interview conducted during the execution of a search warrant was not custodial even though entry by law enforcement created a "'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location," but "shortly thereafter, the search warrant was announced, the handcuffs were removed, and the residents were told that they were not under arrest"). Likewise, the fact that a minority of law enforcement agents had their weapons drawn upon entering and securing the house does not militate towards a finding that Defendant was in custody during the interview because no firearms were brandished while Defendant was being questioned.  Peck, 17 F. Supp. 3d at 1364.  Furthermore, as discussed above, the tone of the interview itself was conversational rather than accusatory.  Defendant remained calm, chose to continue to engage in the interview despite repeated assurances that he was not under arrest, never asked to stop the interview, willingly assisted the agents in locating computers and hard drives with illicit materials, and readily authorized access to his e-mail accounts.  Thus, this Court cannot conclude that his initial restraint rendered the interview custodial.

19

Finally, although the interview was lengthy – lasting approximately two hours and forty-five minutes – the segments were each under an hour and there is no evidence that the agents "did not diligently execute the search warrant" while Ford and Ashley interrogated Defendant.  Asher, 2010 WL 4192883, at *12 (finding a two and a half hour interview non-custodial).  This Court is not persuaded by Defendant's argument that the law enforcement officials should have left the premises and terminated their interview with Defendant as soon as they obtained the computer and hard drives containing child pornography.  The law enforcement officers did not locate those items until approximately half-way through the interview, and there is no evidence tending to show that the agents had fully completed their search by that time.  (See Gov't's Ex. 1, at 62-63; Gov't's Ex. 2).  Indeed, while Defendant initially stated that illicit material might be stored on a computer and one hard drive, over six hard drives of child pornography were obtained.  Moreover, the final portions of the interview with Defendant were spent obtaining e-mail records of Defendant, which arguably come within the scope of the search warrant being executed.  (See Gov't's Ex. 1, at 102-117; Def.'s Ex. 1, Att. B, Secs. 4, 6, 7, 10 (authorizing, among other things, the search for and seizure of "any and all records and materials, in any format and media (including but not limited to . . . e-mail, chat logs and electronic messages . . . pertaining to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct" or "identifying persons transmitting" such images).  Similarly, while Ford testified that she interviewed Defendant with the hope of eliciting a confession, her

20

subjective viewpoint is irrelevant to the custodial analysis. J.D.B., 131 S. Ct. at 2402. Thus, even though the interview was lengthy, there is no indication that it was improperly so or that it was so long as to create a custodial atmosphere.

Ultimately, this case fits well within a recent line of similar cases decided the same way in this District. See, e.g., United States v. Kimbrell, No. 1:14-CR-90-TCB, 2015 WL 4641533, at *14-19 (N.D. Ga. Aug. 4, 2015); Peck, 17 F. Supp. 3d at 1353-66; Graham, 2014 WL 2922388, at *5-8; Asher, 2010 WL 4192883, at *7-15. Each involved motions to suppress statements made by defendants during interviews conducted in the course of the execution of search warrants seeking evidence of child pornography. Kimbrell, 2015 WL 4641533, at *14-19; Peck, 17 F. Supp. 3d at 1353-66; Graham, 2014 WL 2922388, at *5-8; Asher, 2010 WL 4192883, at *7-15. Those defendants were not subject to arrest warrants, not arrested during or immediately after their interviews, and not notified of their rights under Miranda. Kimbrell, 2015 WL 4641533, at *14-19; Peck, 17 F. Supp. 3d at 1353-66; Graham, 2014 WL 2922388, at *5-8; Asher, 2010 WL 4192883, at *7-15. Nevertheless, in those cases, motions to suppress were uniformly denied because the defendants' statements were voluntarily made and the defendants were not in custody during the interrogations. Kimbrell, 2015 WL 4641533, at *14-19; Peck, 17 F. Supp. 3d at 1353-66; Graham, 2014 WL 2922388, at *5-8; Asher, 2010 WL 4192883, at *7-15. For all the reasons stated above, this Court agrees with the reasoning in those cases. Here, Defendant was interviewed in his home during the execution of a valid search warrant, was told he was not under arrest at least

five times, was not threatened, was interviewed in a calm and conversational manner, was provided with multiple breaks, never asked for an attorney or other counsel, and willingly provided evidence and information to law enforcement.   In these circumstances, Defendant has not met his burden in showing that an objectively reasonable, innocent person in his position would have felt a restraint on his freedom of movement of the degree associated with a formal arrest.   As a result, Defendant cannot show that he was subjected to a custodial interrogation and entitled to <u>Miranda</u> warnings.   Accordingly, Defendant's Motion to Suppress Statements should be **DENIED**.  (Docs. 11, 30).

## **CONCLUSION**

Based on the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**.   (Docs. 11, 30).  As there are no further motions pending, the undersigned certifies this case ready for trial.   The Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this <u>16th</u> day of October, 2015.

/s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

22